Thank you. I will reserve three minutes. Good morning, justices. Please support Robert Scott on behalf of now the estate of Mark Lopez. Justices, we're called upon today to review really a very interesting question of how long is enough? How long is a time period before it becomes unreasonable in the context of a claims decision? A lot of case law has gone back and forth, and in my review in preparation for argument, I thought the most important thing I wanted to present to you and differentiate some of the other cases, some of the auto cases and the like in the context of bad faith, most importantly is the type or class of insurance we have here. This is disability insurance. I know because I've done in my past life some judge's disability retirement cases. I've litigated for the police officers as well as for county employees, etc. Here this is a private policy, so because we're sitting in diversity, the Court has the benefit of California bad faith law to review it and hopefully apply here. I did want to bring to the Court's attention a very new case from the Ninth Circuit, a public decision, Handgartner v. Paul Revere slash Unum. That and the Amadeo case, I think, are the two touchstones in terms of the position we take today. REED Have you filed a 28-J letter, counsel? JEFFERSON I did not, and, Your Honor, it occurred to me on the car ride up here when I had read the briefs last night. The briefs were done, as you know, some time ago, and Handgartner has subsequently been decided, so if you would like me to, I can subsequently. REED I recommend that you file the 28-J and get a post-counsel notice. JEFFERSON I will also bring that citation to your attention. Thank you. So this is disability insurance, and this is the equivalent to payroll protection. It's sold that way. The marketing materials are that way. The promise is made that if you by the policy terms, we will protect you, we the insurance company. The policy itself says that. In my reference to the administrative record in the policy, the notice of claims decision says within the policy, if 90 days after receipt of claim you haven't heard from us, you can review as if it is denied. The policy itself reflects a 90-day period. Turning the table within the policy, it also says if we don't hear from you and we're paying you, and we don't hear from you the claimant within 60 days to reaffirm your monthly disability, we can cut you off. So within the policy itself, we have the confines of what should or shouldn't be deemed reasonable. A month or two, yes, but justices, for someone who is down and laboring down in the trenches, this is payroll protection. Most good working people in this country can't go months without benefits. They are not of wealth to be able to sustain six months or a year without benefits in the context of a promise. That's found in that public policy, though it isn't just expressed in the policy. It's found in the California Administrative Code, which I've argued to you, which is 2232.24, which specifically applies to this type of insurance disability, which says the carrier, once presented with proof of loss, now remember the proof of loss is from the carrier. They can decide what the terms of the proof of loss should be, but once that proof of loss is presented to the carrier, as it was here, the claim is complete, if you would, provided all the necessary paperwork. Counsel, you don't dispute that the insurance company is entitled to insure that the insured is actually disabled, though? Well, Rana, you come right into my point. All of that proof of loss showed only one inescapable point, and that was that his attending physicians were saying he's disabled and another important fact that cannot be overlooked. As the defense points out, this man had worked for 20 years as a maintenance worker for the city of Fountain Valley, 20 years. He came in and had the worst headache of his life on January 4th of that year. Now, all of us that know that means if you ever have the worst headache of your life, you need to go immediately to an emergency room because you very well may be having a stroke, which is, of course, what happened here. But the point I want to come back to, Your Honor, and answer your question, once they have that proof of loss, once they have the initial required documents, then they have to do something. They cannot do nothing. They must do one of two things, pay or pay with a reservation of rights, so that they could later recover that money if, in fact, it turned out that they made a mistake. You're saying they cannot investigate the claim? While they're paying, yes, they can. They've got to pay and investigate. They can't investigate and then determine whether they're going to pay? Well, they can for a month or two, Your Honor. But after a month or two goes by, we have to What case says that you only have a month or two to do it? Well, there's California case law. And again, my last point was California case law. California case law in this field says if you deny benefits, there's no we don't have one that says some specific magic month. But my point to you is both the policy itself and the administrative reg in California, supported by McCormick v. Sentinel, supported by a number of California cases, says you cannot, you have to act, you act at your peril. And you have to do so quickly. Is it unreasonable for us to think that a huge insurance company, a multinational insurance company, cannot act within two months? I think Judge Thompson asked you a very specific question, which was what source of law or contract do you have for imposing on the insurance company an obligation to pay pending investigation? The California reg. Okay. And what regulation is that? It's cited in my brief, and it is regulation 2232.24. It's found in the administrative record at page 252, and it's on page 19 of my brief. Okay. And what does that say? It says once the company receives proof of loss, they must pay. Okay. But the whole question, that sort of begs the question, counsel, as to what proof of loss constitutes. But you've made a different argument, which was the insurance company has a reasonable time to determine the claim, and then their obligation is to pay on the claim, and if they subsequently learn information, then they have a right of recoupment. But they pay with a reservation of rights. Right. Okay. And we're going to do that here. Okay. But where in the administrative regulation does it say that they have an obligation to pay with the right of recovering their losses? Well, Your Honor, the regulation doesn't say that. You're adding a little nuance to it. Well, I'm interested in the point about the reservation. Yeah. Let me just say it this way. A carrier can do one of two things. It can pay without a reservation of rights, meaning it has no right to recover those monies, and it's commonly done. It's a custom of the industry, Your Honor, well recognized. They can pay with a reservation of rights. If they pay with a reservation, they are, in fact, reserving those rights to themselves to seek recoupment if it turned out they paid in error. But the point we have to be sensitive to here is, this is where the risk of harm is so great to the insured because of the nature of the insurance, that that type of procedure must be sanctified. And I believe that McCormick v. Sentinel, one of the cases I'm sure I cited in my brief, does talk about the responsibility of the carrier in any delay would be a potential basis for bad faith. But here, what they ultimately did was they had him exempt months even after the lawsuit. But let me just remind you, Your Honors, this is a... And they paid 100% of all the benefits here. Well, they did, but he had already incurred attorney fees. He'd already been out for a year. He had horrible financial and economic loss. And frankly... Is it possible, Counsel, that the filing of the lawsuit only heightened their sense of... Here, I mean, is it possible that perhaps this suit was filed a little prematurely? But, Your Honor, remember, before this suit was filed, we filed it on August 22nd. There was an August 5th letter sent by the carrier to Mr. Lopez and his physicians. That's the key to the case, other than the time period. And the August 5th letter said? It said, we agree with our doctor who says you're not disabled. Now, he's the insured. And by the way, we're sending a copy of this letter to your doctors and have them respond. One of his doctors is a neurologist. In today's world, is it reasonable to think that a neurologist would receive that mail, pull his file, dictate a response for free? As I recall, she didn't respond at all. Is that right? I think it was Dr. Farrer, but did not respond. That's because, again, the carrier could have sent a $100 payment and say, we would like you to respond to our doctor's letter. Please do so. Remember, Mr. Lopez was disabled, not working, had no money, and he saw the doctor. You can't get a neurologist to review a file and write a letter for free in today's world. It's unbelievable that the carrier would even posture it in that way. Here the point is, that letter said, we don't think you're disabled. Now, we agree with our doctor. Justices, Erica and Moore, cases I cited to you, say the carrier is deemed to know, when it sells insurance in the state, what our standard of disability is. And as we know, it's read into the policy by conformity with state law statute, which is a mandatory provision. So they have to apply Erica and Moore. When I went back there, this six-month employee did not know of those cases, did not know of the standard, never gave the standard to the doctor or the nurse that reviewed it. Those things alone are bad faith and subject the carrier to both exposure to potentially bad faith and punitive damages. All we ask for is, those are tribal issues because there's more than one inference to be gathered. Justices, frankly, from one who labors in the field, it is a very troublesome area. When we have these, we need your direction. Amadeo was a wonderful direction to us. We need it reaffirmed, and we need it reaffirmed especially in light of Hank Gardner. And I see I'm up, and hopefully I've reserved a minute or two for rebuttal. Well, actually, counsel, you're over your time, but we will allow you a minute to reply. Thank you very much. Ms. Green? Good morning. Again, my name is Leslie Green. I'm here on behalf of Jefferson Pilot. And if I may address what did happen here. The facts are undisputed, and what happened is that in August, excuse me, in April, as soon as Jefferson Pilot received the claim form, they requested medical records. Because the initial claim forms did not establish proof of loss. There was, he was claiming headaches and memory loss. The doctor's report indicated there are several post-traumatic stress, for example, but there was no indication anywhere that there had been any trauma, any accident, any hospitalization. So it was reasonable for the company to get medical records. They immediately requested medical records. In the next month, they had all the medical records, and they found out that the treating physician, Dr. Mitchell, had only seen Mr. Lopez a couple of times since the January date when he was claiming disability. And actually, she had referred him out to a neurologist because she was unsure of what the diagnosis or what was really going on with him. The neurologist, aware that this individual had had a trauma 20 years before, which had not prevented him from working, but it had certainly caused him damage and impairment. And so the neurologist immediately sent him for an MRI to see if there had been a stroke. And in fact, he determined that there had not been a stroke. To the extent there was a stroke or a brain impairment, it related to the trauma 20 years prior. You know, I think we all understand that, and we know the record. I think the question is, though, in those circumstances, what is the company's legal obligation? Now, Mr. Scott, as you heard, relies very heavily on the insurance commission's regulation. I guess my question to you is, under that regulation, 2232.24, what is the meaning of the phrase in there, due written proof of loss? What does that mean? Does that mean that, Mr. Scott says, you know, as soon as the insured turns in a piece of paper supported by his doctor's opinion, that he suffered a loss, that's the end of it. You have to start paying. That's the way he interprets it, right? That is the way he interprets it, yes. And what's wrong with that? I think what's wrong with that, Your Honor, is that that's not what the policy says. That's not what any case has ever said. What the case is going to say. You mean the policy doesn't use one of these forms in the insurance code? The policy – well, the policy does. But the code says compulsory uniform provisions. The policy – there's two different things. There's the claim form that the company does use, and which they used in this case. And the policy talks about receiving proof of claim. And it talks about receiving information from you and from your doctor and whatever other information we need to determine, in fact, that you're entitled to benefits. That's what the policy says. And, in fact, a long line of cases in California, and as interpreted by the Ninth Circuit, indicates that an insurance company does have an opportunity – in fact, an obligation – to investigate a claim and to determine whether an individual qualifies for benefits before paying that claim, as long as they reasonably and diligently pursue that investigation, as long as they don't look for things that are unnecessary, for example, and as long as there are not long delays during the investigation. All right. All right. In this context, what's your best case that supports that notion? In other words, that – I think maybe Judge Thompson indicated this, too, that the insurance company has the right to make a reasonable investigation before making any payments. Right? And that's – I think that's what you just stated. Yes. I assume case law supports that proposition, right? Yes. And what case is that? Well, there's many cases. There's the Egan case that talks about the obligation of the insurer to pursue an investigation. The Phelps v. Provident case, which is in our records. Judge Terezian's case goes on at length about that. That was an individual that they had been paying for a number of years, and that ultimately they had new information and determined that he was not disabled. And it talks in there about the company's obligation to investigate, but there is no obligation to pay a claim when there's a reasonable dispute as to whether that claim is payable. And in that case also talks about the Blake case in which the court said it's not unreasonable for a company to not pay a claim when there's information that indicates that this claimant may not be disabled. Why didn't you pay with a reservation? The main reason, Your Honor, is that if a claim is paid with reservation of rights, that actually creates problems for the insureds for two reasons. One, an insured may then expect they don't understand where the reservation of rights is, and therefore they expect that there's going to be this continuing stream of money and may have certain obligations that they incur based upon the expectation that they're going to receive that. And second, I think it's undisputed that when a claim is paid under reservation of rights and the company, if they ultimately determine a claim is not payable, have a right to get that money back. And so what you're really doing is incurring, imposing a potential new obligation upon the insurer to pay this money back in the future. And for a number of reasons, therefore, it seems like it's more prudent to make that determination as promptly as you can, and then once that determination is made, to pay or not pay the claim depending upon that. And in fact, none of the, both sides have cited many cases that talk about the genuine dispute issue and whether it's reasonable or unreasonable, and finding that it's reasonable as a matter of law to not pay a claim. In none of those cases do they say it's a requirement to pay a claim that's questionable under reservation of rights. None of those cases say that, and all of those cases that we cited found that there was no bad faith as a matter of law. Now, just a minute. So what remains in this case disputed is, one, whether there was any bad faith conduct, because as far as payments due under the policy, you're up to date on those, right? Everything was paid. All right. So the only thing that remains is a bad faith. Correct. Well, yes. And it also, if I may just touch on that part of the motion, the motion that Judge Collins ruled on was that there was no basis for an imputative damages claim. Right, which is sort of a variation of the same question, right? It is, but it's also separate. I mean, there's a higher burden of proof and there's additional things that have to be shown. Right. All right. Now, Mr. Skye indicated in his remarks that Mr. Lopez had been to the emergency room and, in fact, that there was a determination that he had a stroke. I submit that is not supported by the record. And in fact, what happened is that the CVA that they referred to, as I mentioned, did refer to something that happened a long time ago. So what the company was faced with is an individual who had an impairment, as if he had an accident when he was 18 and one hand had been cut off, and he nonetheless worked for the next 20 years. And then when he puts in a claim, Mr. Skye's position would say, well, you should pay him because he only has one hand. Well, the company's question is, look, we know you had this old impairment, and but now the question is, you were working with that, what is the impairment that prevents you from working at your occupation now? And what Dr. Moore said, in her report, she was a neuropsychologist, and she said, there is some impairment, I see some of this old impairment, and most of it is minor, but it does exist. And Dr. Farrar said that, in his opinion, most of the complaints were trivial and attributable to stress, and that Mr. Lopez was overstating his impairments. Now that goes back to the company, and they had that reviewed, because these doctors didn't really put that in the focus of his occupation. So they sent this information, they did not deny the claim at that point, they sent it out for review. The doctor who reviewed it indicated that Dr. Moore's finding of impairment still placed him, I think it was at 63%, it was above average intelligence and memory and cognitive abilities, which should not be a particular occupation. Still, the company did not deny it, but they sent this information to the doctors, and as they should, they kept Mr. Lopez informed. All along the way, they said, look, we're getting the records, now we have the records, now we have this review attempt to indicate that you do not qualify for benefits, but we're sending this to your doctor. That is not a denial letter. It did not have, I did not tell them they were denying the claim, it did not have the referral to the California Department of Insurance, that sort of thing. Rather, it was keeping him advised that they had an obligation to do, where they're coming from, so that he could talk to his doctors and do whatever he needed to do. And it was at that point where Dr. Mitchell came back and said, we'll see these other reports, which they already had, which didn't say he was disabled. So all along the line, the company had information which cumulatively seemed to indicate that this man had minor and not severe impairments, except possibly for stress, which he was not receiving treatment for. He stopped that treatment during the elimination period. But they continued to investigate, and were continuing to do so when the lawsuit was filed, which did slow down getting the IME doctors, because having lawyers involved often slows things down. But once that was done, and their reports came back, the company paid the claim. Now, there's no dispute as to the facts, and given those facts and the criminology. When those final reports came back, my reading of it, they didn't look like they were all that cold that the person was permanently disabled. It looked like it was still a little questionable. Am I right about that? You are right, sir. But what it did say is that he had some impairment that related to his occupation. One of them at least said he can't operate heavy machinery, and he shouldn't be driving. Well, those were two of the duties of his occupation. So to be totally disabled doesn't mean you can't do anything under this policy. It means you can't do some of the material duties. And the company looked at that and felt, well, in his occupation, he can't do, according to this doctor, some of the material duties because he needed to operate machinery. So on that basis, they paid the claim. Thank you, Counsel. Thank you, Your Honor. Mr. Scott, we'll give you one minute. Thank you. Let me just make three quick points. One is as to the proof of loss, the issue of the proof of loss, remember, again, they're in the uniform provisions that Justice Tsushima refers to. Notice of claim and proof of loss are mandatory provisions, and all they say is the company can decide whatever the form of proof of loss should be. But once it lays that out and says, here's what you must send us, once you send it, in other words, complying with their request, they've got to pay, and they can pay with the reservation. Second point. I guess I've heard it, but it was hard for me to accept, that in today's world, given disability insurance, counsel and the carrier wants to argue to you that, oh, paying the benefit with a reservation would just create a hardship to the insured, so that's why they don't do it. That's an absurd argument. This is, once you have the money in your jeans, you can spend it to live. The last point, the report. But you don't dispute that if they pay with a reservation and determine subsequently that they're not, in fact, disabled, then there's an obligation on the part of the insured who's had this money and spent it to repay the money. Well, yes, unless the carrier made the wrong decision about denying, about saying he's not disabled. Well, that might suggest, then, that the carrier ought to be, wants to be careful about all of this and get all full information before they pay these claims. Let's spin it the other way, Your Honor, in all deference. Let's spin it the other way. The way for them to avoid this liability that we all review today is very simple. To pay it under a reservation of rights. Then I can't complain about this delay and the hardship it causes. Let's not think it down the line and say, well, then they would be, for their bad faith, no, it would cut off their ability to be in bad faith if they paid properly with a reservation. And then if they decide the person's not disabled, then they can make live or die over that claim decision down the line and we'll all assess that then. And they have to act as they always do. Hey, they have to make claims decisions. That's what they're in the business of doing. They better know how to make them right. And lastly, Your Honor, Justice Thompson, you say the reports of the two IMEs and your reading of them was that they were a little bit equivocal. Your Honor, that's because they didn't give those doctors, even after this litigation had proceeded, the correct standard of disability found in Erica and Moore, and Moore says that Erica's been around since 1942 in this state, California Supreme Court, and by God, if they don't follow it, then they act at their peril. That's where we are here today. Thank you, Your Honor. Thank you very much. All right. That case will be submitted.
judges: Thompson, Tashima, Bybee